## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GLORIA JEAN ROOT,            :
                             :
        Plaintiff            :     CIVIL NO. 1:13-CV-00655
                             :
    vs.                      :
                             :
CAROLYN W.COLVIN, ACTING     :
COMMISSIONER OF SOCIAL       :     (Judge Rambo)
SECURITY,                    :
                             :
        Defendant            :

### MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Gloria Jean Root's claim for social security disability insurance benefits.

Root protectively filed[1] her application for disability insurance benefits on February 4, 2010. Tr. 12, 148-150, 155 and 157.[2] The application was

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of her Answer on May 21, 2013.

initially denied by the Bureau of Disability
Determination on May 27, 2010.[3]  Tr. 12 and 96-100.  On
June 21, 2010, Root requested a hearing before an
administrative law judge. Tr. 12 and 103-104.  After 11
months had elapsed a hearing was held on May 24, 2011.
Tr. 28-94.  On June 30, 2011, the administrative law
judge issued a decision denying Root's application. Tr.
12-23.  On August 3, 2011, Root filed a request for
review with the Appeals Council, and after over 17
months had passed, the Appeals Council on January 15,
2013, concluded that there was no basis upon which to
grant Root's request for review. Tr. 1-8,  Thus, the
administrative law judge's decision stood as the final
decision of the Commissioner.

Root then filed a complaint in this court on
March 12, 2013.  Supporting and opposing briefs were

───────────────

3.  The Bureau of Disability Determination is an agency
of the state which initially evaluates applications for
disability insurance benefits on behalf of the Social
Security Administration.  Tr. 97.

submitted and the appeal[4] became ripe for disposition on
August 6, 2013, when Root filed a reply brief.

Disability insurance benefits are paid to an
individual if that individual is disabled and "insured,"
that is, the individual has worked long enough and paid
social security taxes. The last date that a claimant
meets the requirements of being insured is commonly
referred to as the "date last insured." It is
undisputed that Root meets the insured status
requirements of the Social Security Act through December
31, 2014. Tr. 12, 14 and 155.

Root was born on April 17, 1964, and at all
times relevant to this matter was considered a "younger
individual"[5] whose age would not seriously impact her
ability to adjust to other work. 20 C.F.R. § 404.1563©;
Tr. 34 and 148.

---

4. Under the Local Rules of Court "[a] civil action
brought to review a decision of the Social Security
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

5. The Social Security regulations state that "[t]he
term younger individual is used to denote an individual
18 through 49." 20 C.F.R., Part 404, Subpart P,
Appendix 2, § 201(h)(1).

Root who withdrew from school after completing the 10th grade and who obtained a General Equivalency Diploma (GED) in 2000 can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, and handling her own finances. Tr. 39-40, 64, 160 and 193.  During her elementary and secondary schooling, Root attended regular education classes. Tr. 162.  After obtaining a GED Root did not complete "any type of specialized job training, trade or vocational school." Id.

Root's work history covers 30 years and at least 3 different employers. Tr. 152-154, 156, 172 and 184. The records of the Social Security Administration reveal that Root had earnings in the years 1980 through 2009. Tr. 156.  Root's annual earnings range from a low of $1654.90 in 1982 to a high of $18,643.22 in 2008. Id. Root's total earnings during those 30 years were $315,412.23. Id.

Root has past relevant employment[6] as (1) a finisher of dentures (orthodontic laboratory technician) which was described by a vocational expert as skilled, light work, and (2) a sewing machine operator which was described as semi-skilled, light work as normally performed in the economy but semi-skilled, medium work as actually performed by Root. Tr. 85.

Root claims that she became disabled on September 22, 2009, because of both physical and mental impairments. Tr. 35-36, 96, 148 and 161.  Root identified depression and stress as her mental health impairments and back pain radiating into the right lower extremity, involving degenerative disc disease, as her physical impairment. Tr. 161 and 297.  Root underwent back surgery in late September, 2009, and contends that she suffers from failed back surgery syndrome. Doc. 9, Plaintiff's Brief, p. 2-3.  At the administrative hearing when asked to described the major items that

_____

6.  Past relevant employment in the present case means work performed by Root during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

prevented her from working, Root focused on the side effects of the medications she takes, including morphine. Tr. 41-46. She also noted that pain associated with her conditions prevents her from sitting or standing for long periods of time and that during the day she frequently naps in a prone position. Tr. 47-52. Root last worked on September 21, 2009. Tr. 36.

Although Root claims that she has been disabled and unable to work full-time since September 22, 2009, the record reveals that Root applied for and received unemployment compensation benefits during the third and fourth quarters of 2009 and the first quarter of 2010.[7] Tr. 14, 35-38 and 150.

For the reasons set forth below we will affirm the decision of the Commissioner denying Root's application for disability insurance benefits.

**STANDARD OF REVIEW**

---

7. An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). The administrative law judge correctly noted in her decision that applying for and receiving unemployment benefits was not dispositive of the issue of Root's disability claim but that it impacted the assessment of her credibility. Tr. 14.

6

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported

by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## **SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This

10

process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of

_____

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

9.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An
(continued...)

impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and

───────────────

9.  (...continued)
individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

continuing basis.  See Social Security Ruling 96-8p, 61
Fed. Reg. 34475 (July 2, 1996).  A regular and
continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or
other similar schedule.  The residual functional
capacity assessment must include a discussion of the
individual's abilities. Id; 20 C.F.R. § 404.1545;
Hartranft, 181 F.3d at 359 n.1 ("'Residual functional
capacity' is defined as that which an individual is
still able to do despite the limitations caused by his
or her impairment(s).").

**MEDICAL RECORDS**

       The medical records reveal that Root was treated
for both physical and psychological problems.  We will
commence with Root's medical records that predate
September 22, 2009, the date Root alleges that she
became disabled.

       On May 22, 2007, Root had an appointment with
Marlene Claman, a certified physicians assistant, at the
Fredericksburg Community Health Center regarding

bilateral flank pain. Tr. 349.  The report of this appointment reveals that Root was a new patient who had a history of depression and had been taking Lexapro[12] and Prozac, both antidepressants, but those drugs did not help and she was presently taking citalopram[13] and doing well. Id.  The report further reveled that Root had a history of gastrointestinal problems. Id.  The results of a physical examination were essentially normal. Id. Root did have some flank pain and mild pain when Ms. Claman attempted to "capture the right kidney."[14] Id.  A urinalysis was normal. Id.  Ms. Claman's diagnostic

---

12. "Lexapro (escitalopram) is an antidepressant . . . used to treat anxiety in adults and major depressive disorder in adults[.]" Lexapro, Drugs.com, http://www.drugs.com/lexapro.html (Last accessed March 26, 2014).

13. "Celexa (citalopram) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs)." Celexa, Drugs.com, http://www. drugs.com/celexa.html (Last accessed March 26, 2014).

14. This is a procedure where the right kidney is felt or palpated. The left kidney is more difficult to discern. See Kidney Centre, Physical Examination, http://urologyindia.org/main.php?id=18 (Last accessed March 26, 2014).

assessment was that Root suffered from thoracic back pain, depression, reflux and bullous pemphigus.[15] Id. Root was advised to take the nonsteroidal anti-inflammatory drug ibuprofen twice daily for the next week and perform stretching exercises. Id. Ms. Claman also ordered an x-ray of the thoracic spine. Id.  The x-ray was performed on the same day and revealed "degenerative spurring and narrowing of [the] disc space at [the] T11-T12 level." Tr. 481.

On May 24, 2007, Root had a follow-up appointment at Fredericksburg Community Health Center with Robert E. England, a certified physicians assistant, at which Root continued to complain of back

---

15. Bullous pemphigus or pemphigoid "is a rare skin condition that causes large, fluid-filled blisters on areas of the skin that often flex - such as the lower abdomen, upper thighs or armpits. . . [It] occurs when your immune system attacks a thin layer of tissue below your outer layer of skin.  The reason for this abnormal immune response is unknown, although it sometimes can be triggered by taking certain medications." Bullous pemphigoid, Diseases and Conditions, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/bullous-p emphigoid/basics/definition/CON-20028528 (Last accessed March 26, 2014).

pain. Tr. 350. Root reported receiving no benefit from taking ibuprofen. Id.  A physical examination revealed "tenderness with palpation along the paraspinal musculature over the course of the thoracic area" but "[n]egative straight leg raises bilaterally."[16] Id. The diagnostic assessment was "[p]ersistent mid back pain" and Root was prescribed the nonsteroidal anti-inflammatory drug Celebrex and the muscle relaxant Flexeril, and encouraged to apply ice to the painful areas after any activity and moist heat at other times and to perform stretching exercises. Id.

At an appointment with a medical provider at Fredericksburg Community Health Center on August 9, 2007, Root reported that her gastroesophageal reflux

---

16.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed March 26, 2014).

disease was stable on Nexium;[16] she felt Celexa was helping her depression; her back pain was stable as a result of taking the nonsteroidal anti-inflammatory drug naprosyn as needed; and her skin condition (bullous pemphigoid) was stable on dapsone[17] and she was continuing to see a dermatologist. Tr. 351. The results of a physical examination were normal. Id.

The medical records from 2007 do not reveal any problems with Root's gait or ability to stand, walk, sit, and lift or carry items. Also, they do not reveal that Root had any muscle weakness, decrease in muscle tone, or any neurological problems such as impaired sensation.

---

16. "Nexium (esomeprazole) belongs to a group of drugs called proton pump inhibitors. [It] decreases the amount of acid produced in the stomach. . . [and] used to treat symptoms of gastroesophageal reflux disease (GERD) and other conditions involving excessive stomach acid[.]" Nexium, Drugs.com,http://www.drugs.com/nexium.html (Last accessed March 26, 2014).

17. Dapsone is an antibiotic used to treat leprosy and other skin conditions. Dapsons, Drugs.com, http://www.drugs.com/cdi/dapsone.html (Last accessed March 26, 2014).

Root continued to have appointments at and received treatment from Fredericksburg Community Health Center during 2008. Tr. 239-242 and 356.

On January 11, 2008, Root was assessed by a medical provider[18] at Fredericksburg Community Health Center as suffering from depression but Root declined counseling. Tr. 239. The medical provider increased Root's dosage of Celexa to 40 mg per day. Id.  There were no abnormal findings recorded regarding Root's musculoskeletal system. Id.  Root's current medications were as follows: Nexium, dapsone, the antibiotic Zithromax, and citalopram. Id.

On February 21, 2008, Root had an appointment at Fredericksburg Community Health Center and denied any anxiety or depression. Tr. 240.  Root reported "left knee pain and stiffness with long walking/standing or after sitting for [a] period of time" but "[n]o swelling or redness." Id. There were no objective physical

---

18.  The record is unclear as to whether Root was examined by a physician, physicians assistant or a nurse.

examination findings recorded with respect to the left knee. Id. The medical provider ordered an x-ray of Root's left knee. Id.  The x-ray revealed "[n]o acute bony changes" but the physician interpreting the x-ray stated that "[e]arly [degenerative joint disease] along the medial aspect [of the knee could not] be ruled out." Tr. 402.

On October 13, 2008, Root had an appointment at Fredericksburg Community Health Center with Shelby Margut, M.D.,[19] at which Root complained of low back pain but she denied joint pain, joint stiffness, swelling, tenderness, tingling and weakness. Tr. 241. Root reported that she was sleeping at night. Id. The results of a physical examination were essentially normal. Id. Root had normal muscle strength, full range of motion of the spine, and no muscle spasms. Id. She could walk on her heels and toes and was able to get up on her

_____

19.  Dr. Margut was Root's primary care physician.

tiptoes.[20] Id. Sensation was intact to light touch and she exhibited normal coordination. Id. She did have slight tenderness to palpation of the lumbar paraspinal muscles. Id.  Dr. Margut prescribed the narcotic-like pain medication tramadol and the muscle relaxant Flexeril and ordered an x-ray of the lumbar spine. Id. The x-ray performed on the same day revealed that Root had "bony osteoporosis or osteopenia,"[21] an extra lumbar vertebra (L6) which was sacralized on the left side,[22]

---

20. The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed March 26, 2014).

21. Osteoporosis is defined as "reduction in bone mineral density, leading to fractures after minimal trauma." Dorland's Illustrated Medical Dictionary, 1348 (32nd Ed. 2012). Osteopenia is defined as "any decrease in bone mass below the normal." Dorland's Illustrated Medical Dictionary, 1347 (32nd Ed. 2012). The medical records reveal that Root was prescribed a calcium supplement, OsCal.

22. "Most people have five vertebrae in their lumbar
                                        (continued...)

and moderate to advance arthritic changes at the lower lumbar spine. Tr. 410. The physician interpreting the x-rays recommended that if Root's symptoms persisted that "further evaluation with [an] MRI" [should][] be considered." Id.

An MRI was performed on October 17, 2008, and revealed the following: (1) vertebral body height and alignment was normal; (2) no evidence of fracture, spondylolysis[23] or spondylolisthesis;[23] (3) a transitional

---

22.  (...continued)
(lower back) region, which are named L1-L5. However, some people possess an additional lumbar vertebra located below L5. This extra vertebra, know as the L6, is called a transitional vertebra. About 10 percent of adults have some form of spinal abnormality caused by genetics, and a sixth lumbar vertebra is among the most common of these abnormalities. . . Occasionally, the L6 vertebra can become "sacralized" or attached to the sacrum by a rudimentary joint that creates additional motion - and therefore a greater potential for motion-related stress that can lead to lower back pain." The L6 Vertebra, Laser Spine Institute, http://www.laser spineinstitute.com/back_problems/vertebrae/l6/ (Last accessed March 21, 2014).

23.  A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture
(continued...)

disc space at S1-2; (4) degenerative disc changes at all levels; (5) diffuse disc bulges at all levels with left side predominance; (6) bilateral facet joint arthropathy at L5-S1 causing a mild degree of spinal stenosis, moderate to severe left-sided foraminal narrowing, and mild right-sided foraminal narrowing; (7) a mild degree of spinal stenosis and mild to moderate degree of bilateral foraminal narrowing at the L4-L5 level; and (8) mild degree of spinal stenosis and mild bilateral

---

23.  (...continued)
or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

23.  A spondylolisthesis is a forward slip of one vertebra relative to another. Id.

foraminal narrowing at the L3-L4 and L2-L3 levels.[24] Tr. 457-458.

------

24. The spine consists of several elements including vertebral bodies and intervertebral discs. The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance.

Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain.

Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints.  In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

Based on a referral from Dr. Margut, Root
commenced physical therapy at First Choice
Rehabilitation Specialists on October 21, 2008. Tr. 212.
After an initial evaluation by the physical therapist it
was recommended that Root have physical therapy two
times a week for four weeks. Id.

On November 5, 2008, Root had an appointment
with Dr. Margut at which Root continued to complain of
low back pain. Tr. 242. Root reported that the physical
therapy which she had been attending for 2 weeks was not
helping to any great extent. Id. She reported that
although she had no numbness or weakness she could not
get comfortable and that she was interested in epidural
steroid injections. Id. The results of a physical
examination were essentially normal other than Root's
lumbar paraspinal muscles were tender to palpation. Id.
Root exhibited no muscular spasms and she had a negative
straight leg raise test. Id. Dr. Margut recommended
that Root continue the physical therapy and referred her
to a pain clinic for possible epidural steroid

injections. Id. Also, on November 5, 2008, Root underwent a bone density scan for osteoporosis and osteopenia. Tr. 210. The results of that scan were interpreted by a physician as normal and that Root had a low risk of fracture. Id.

On November 7, 2008, Root had a physical therapy appointment at which she complained of bilateral low back pain but no radiating pain. Tr. 217. Root's physical therapy was put on hold until after she received epidural steroid injections. Id.

On December 1, 2008, Root was evaluated by Gregory S. Wickey, M.D., a pain management specialist, at Lebanon Anesthesia Associates.[25] Tr. 332-335. Roots current medications listed were Nexium, dapsone, citalopram and tramadol. Tr. 332. Root complained of back pain that radiated to the left and right at the point where the thoracic and lumbar portions of the spine meet and at the point where the lumbar and sacral

---

25. Dr. Wickey is also associated with The Spine Specialists located in Lebanon, Pennsylvania. Tr. 566. He is board certified in anesthesiology. Id.

portions of the spine meet. Id.  Root denied any
radiation of pain to the upper and lower extremities.
Id.  The results of a physical examination were
essentially normal other than with respect to the
musculoskeletal system. Tr. 333-334.  However, with
respect to that system the findings were not that
adverse. Tr. 334. Root had tenderness over the ridge of
the spine at the thoracic 8 level and along the right
parathoracic muscles down into the lumbar region.[26] Tr.
334. Root also had tenderness along the ridge of the
spine at the L5 and L6 level and a leftward scoliosis.[27]
Id.  She had functional motion of the lumbar spine,
though with a clear aggravation of her back pain at 70

_____

26.  The medical record refers to the ridge of the spine
as the spinous process, the bony protuberance that is
felt when a finger is run along the length of the
spine. The parathoracic muscles are the muscles that
run parallel to the spine.

27.  Scoliosis is "an appreciable lateral deviation in
the normally straight vertical line of the spine."
Dorland's Illustrated Medical Dictionary, 1681 (32nd Ed.
2012).

degrees of flexion and 15 degrees of extension;[26] she was able to toe and heel walk; she had negative straight leg raising tests bilaterally; she had normal muscle strength in the lower extremities; she had normal deep tendon reflexes; she had normal sensation in the lower extremities; she had a normal gait and station; and she ambulated without an assistive device. Id.  Dr. Wickey's diagnostic assessment was that Root suffered from "progressive degenerative disc changes at [the] L5-6 [level]" and he recommended that Root receive epidural steroid injections. Id.  On December 9 and 24, 2008, Root was administered epidural steroid injections at the L5-6 level of the lumbar spine. Tr. 440 and 444.

In 2007 and 2008, as previous noted Root worked full-time as a orthodontic laboratory technician at the medium exertional level and earned $17,818.15 and

---

26. Normal lumbar spine flexion is from 80 to 105 degrees and extension 25 to 60 degrees. Normal Ranges of Motion Figures (in degrees), MLS Group of Companies, Inc., http://www.mls-ime.com/articles/GeneralTopics /Normal%20Ranges%20of%20Motion.html (Last accessed March 26, 2014).

$18,643.22, respectively. Tr. 156. Root continued to receive treatment for her low back condition in 2009 and continued to work full-time up until September 22, 2009, as an orthodontic laboratory technician at the medium exertional level.

On January 9, 2009, Root received a series of fluoroscopically guided steroid injections at the bilaterally facet areas of the L4-L5 and L5-S1 levels of the lumbar spine. Tr. 446-449. The injections were administered by Dr. Wickey at the Good Samaritan Hospital, Lebanon, Pennsylvania. Id. It was reported that Root "tolerated the procedure well with no reactions, problems or complications." Tr. 448.

Thirteen days later, however, Root visited the emergency department of the Good Samaritan Hospital complaining of low back pain. Tr. 426-432. When a medical provider reviewed Root's systems,[27] Root only

---

27. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of

(continued...)

complained of low back pain and denied any other problems, including psychiatric. Tr. 427 and 429. The results of a physical examination were essentially normal other than Root had some mild tenderness to palpation of the bilateral lumbar spine. Tr. 430.  Root was discharged from the hospital with the diagnosis of a lumbar strain. Tr. 431. She was advised to take Motrin and follow-up with her family physician. Id.

On January 23, 2009, Root had additional injections fluoroscopically administered to the lumbar spine by Dr. Wickey. Tr. 450-453. It was reported that Root "tolerated the procedure without difficulty." Tr. 452.

On February 2, 2009, Dr. Wickey wrote a letter to Dr. Margut in which he stated in pertinent part as follows:

> Based upon a phone conversation with [Root] today, she did not experience any benefit with the last injection, even on a temporary basis.

---

27.  (...continued)
Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed March 26, 2014).

> At this time, there is really nothing else to do
> from an interventional standpoint. The patient
> has degenerative changes that might be amenable
> to surgical intervention. Certainly a surgeon
> would have to be consulted to validate that
> consideration and I will defer to you in terms
> of whether you want to move in that direction
> or not.

Tr. 319.

On May 16, 2009, Keith Kuhlengel, M.D., a
neurosurgeon, evaluated Root at the request of Dr.
Margut. Tr. 219-222.  At that appointment Root
complained of back pain radiating into the right lower
extremity. Id.  Root's current medications were Nexium,
dapsone, citalopram, Vicodin[28] and Flexeril. Tr. 220.
Dr. Kuhlengel reviewed the prior diagnostic studies,
including the October, 2008, MRI of Root's lumbar spine,
and observed that it revealed no evidence of a disc
herniation but did reveal disc bulges at multiple
levels; facet arthropathy at L5-S1 causing a mild degree

---

28.  Vicodin is a "combination of acetaminophen and
hydrocodone. . . Hydrocodone is an opiod pain
medication. . . Acetaminophen is a less potent pain
reliever that increases the effects of hydrocodone."
Vicodin, Drugs.com, http://www.drugs.com/vicodin.html
(Last accessed March 26, 2014).

of spinal stenosis, moderate to severe left-sided neural foraminal narrowing, and mild right-sided neural foraminal narrowing; and disc bulging at the L4-L5 level resulting in some mild spinal stenosis and mild to moderate foraminal narrowing. Id.  A neurological examination was normal. Tr. 221.  A motor examination revealed "trace weakness" in one of the muscles of the right calf. Id.  Straight leg raising tests were negative bilaterally. Id.  Her sensation to pin prick and light touch was intact. Id.  Root ambulated "with a moderate base, short stride, slow pace, and rather stiff gait with an erect posture." Id.

After performing the physical examination, Dr. Kuhlengel suspected that Root suffered from L5-L6 disc degeneration with facet arthropathy as the source of her symptoms but he recommended further testing (x-rays, a myelogram/CT scan and electromyography (EMG)) to "try to identify the pain generator and give her options for treatment." Id.

Root's lumbar spine x-ray performed on May 20, 2009, revealed "[s]coliosis and secondary degenerative changes at multiple levels" but "[n]o other findings of consequence." Tr. 471.

The EMG was performed on June 9, 2009, by Tony Ton-That, M.D., at Lancaster NeuroScience & Spine Associates. Tr. 324.  Prior to conducting the EMG Dr. Ton-That performed a clinical interview and physical examination. Tr. 321-323.  During the clinical interview Root reported that she smoked ½ to 1 pack of cigarettes per day and denied any use of alcohol. Tr. 321.  The physical examination revealed that Root had normal muscle strength in her upper and lower extremities; she walked with a normal gait; she was able to walk on her heels and toes; she had no calf tenderness; she had full range of motion of the hips; she had limited lumbar spine range of motion with respect to flexion, extension and lateral bending; she had tender points over the paraspinal muscles of the lumbosacral spine; she had negative bilateral straight leg raising tests; and she

had a normal neurological examination, including normal reflexes and sensation in the upper and lower extremities. Tr. 322.  The results of the EMG and nerve conduction studies were normal. Tr. 324-326.

The lumbar CT scan performed on June 26, 2009, revealed the L6 vertebra and "some distortion to the left side of the thecal sac[29] and emerging left nerve root sleeve at the L5-L6 level related to moderate degenerative disc disease." Tr. 227.  The myelogram performed on the same day revealed "evidence of some degenerative disc disease in the lumbar spine at L3-L4 and L5-L6 without findings suspicious for disc herniation or spinal stenosis." Tr. 229.

On July 28, 2009, Elliot Sterenfeld, M.D., performed a physiatric evaluation of Root at the request of Dr. Kuhlengel. Tr. 307-310.  At that appointment Root

—————————————

29.  The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

reported that she was smoking 1 pack of cigarettes per day. Tr. 308.  The result of a physical examination were essentially normal. Tr. 308-309. Root was obese and had slightly elevated blood pressure. Tr. 308. Also, she had limited "lumbopelvic motion," her lumbar range of motion was painful in all directions, and she was tender to palpation over the right paralumbar region at approximately [the] L4-L5 [level]." Tr. 309.

On August 5, 2009, Dr. Sterenfeld performed a provocative lumbar discography which "demonstrate[d] multilevel degenerative disc changes from L3 through S1" and suggested that Root had an abnormal L5-L6 disc. Tr. 305-306.

On August 20, 2009, Dr. Kuhlengel, after reviewing the results of the diagnostic tests performed up to that date, recommended an L5-L6 diskectomy with fusion and ordered a pre-operative evaluation. Tr. 302-303.

On September 11, 2009, Root had an appointment with Dr. Margut "for [a preoperative] clearance for her

Lumbar Fusion at [Lancaster General Hospital] with Dr. Kuhlengel." Tr. 247-248.  Dr. Margut noted that unfortunately Root was still smoking ½ to 1 pack of cigarettes per day. Tr. 247. The objective physical examination findings recorded by Dr. Margut were normal and he cleared her for surgery. Tr. 247-248. Dr. Margut "encouraged" her to quit smoking.[30] Id.

Root's alleged disability onset date was September 22, 2009. The review of the medical records set forth above and hereinafter reveals no significant change in the objective diagnostic and physical examination findings made before and after the alleged disability onset date of September 22, 2009.

On September 22, 2009, Dr. Kuhlengel performed surgery on Root at the Lancaster General Hospital. Tr.

─────────────────────

30.  It is reported in the medical literature that smoking is bad for patients undergoing lumbar fusion surgery because it can cause a number of significant problems including decreased rate of healing and success of the fusion surgery. See, generally, Larry Davidson, M.D., Cigarette Smoking and Its Impact on Spinal Fusions, spinuniverse, http://www.spineuniverse.com/treatments/surgery/cigarette-smoking-its-impact-spinal-fusions (Last accessed March 24, 2014).

207-209 and 290-291. The surgery involved a decompression and fusion at the L5-L6 level along with the placement of titanium instrumentation. Tr. 290. After the surgery Root was fitted with a brace and participated in physical therapy. Tr. 291. Root did "very well" in physical therapy and was discharged from the hospital on September 24, 2009, in a stable condition. Tr. 291.

Root had an appointment with a physicians assistant at Fredericksburg Community Health Center on October 12, 2009, at which Root complained of a sinus pain. Tr. 249. The report of this appointment is relevant because it mentions that since her spinal fusion she had been taking the drugs Soma, a muscle relaxant, and oxycodone, an opioid pain medication. Id. Root's current medications were Percocet (a combination of oxycodone and acetaminophen), citalopram, Nexium and dapsone. Id. A physical examination performed on October 12th did not address Root's musculoskeletal problems and only revealed nasal congestion and

"scattered wheezes" when inhaling consistent with a sinus infection and bronchitis. Id.  Root was prescribed an antibiotic and encouraged to quit smoking. Id.

On October 21, 2009, Root had an appointment with Dr. Kuhlengel at which Root reported improvement with her right leg symptoms. Tr. 287.  A physical examination revealed that Root's surgical incision had "healed nicely," she moved slowly from a sitting to a standing position, and she ambulated with an erect posture and slow stride. Id.  Dr. Kuhlengel's impression was that Root was "progressing acceptably." Id. Dr. Kuhlengel directed that Root limit her lifting, twisting and bending and advised her to not lift more than 10-15 pounds occasionally. Id.  Dr. Kuhlengel's plan was to wean Root off the oxycodone completely and use Percocet for breakthrough pain only. Tr. 288. Root was provided a prescription for Percocet and a follow-up appointment was scheduled. Id.

At an appointment with Dr. Kuhlengel on December 9, 2009, Root reported that she was "somewhat improved,

but still [had] back pain, especially in the right posterior iliac crest,[31] with some radiation into the right groin." Tr. 285 Root's surgical incision was well healed; she had no palpable spasm; and she ambulated with an erect posture and regular base, stride and arm swing. Id.  Dr. Kuhlengel referred Root to aquatic physical therapy. Id.

On December 28, 2009, Root had an appointment with a physicians assistant at Fredericksburg Community Health Center at which Root complained of a swollen lymph node on the left side of the neck. Tr. 251. Other than that condition, Root denied any other physical symptoms. Id.  Her current medications were list as follows: oxycodone, Percocet, citalopram,  Nexium, dapsone, and Soma. Id.

From January 13, 2010, to February 25, 2010, Root attended physical therapy. Tr. 412.  She attended 12 sessions and the discharge summary states that she

---

31.  The iliac crest is a curved ridge along the top of the largest hip bone, the ileum.

had a fair tolerance of therapy sessions but her condition was unchanged at the time of discharge. Tr. 413. The reason given for the discharge was that Root declined to continue and that she had completed the ordered course of therapy. Id.

Prior to being discharged from physical therapy, Root had an appointment with Dr. Kuhlengel at which she reported that she was "totally" unchanged from prior to her surgery. Tr. 282.  She also reported that the physical therapy was not helping her and sometimes making her condition worse. Id.  However, a physical examination revealed that her surgical incision was well healed; she had no palpable spasm; she was able to ambulate without assistance; and she had normal (5/5) muscle strength in the bilateral lower extremities. Id.

Because of her continuing complaints, Root was sent for an MRI of the lumbar spine. Id.  The MRI was performed on February 16, 2010, and revealed (1) post-surgical and degenerative changes at L4-L5 without significant compression of the thecal sac; (2)

39

degenerative disc disease and osteoarthritis at the non-
surgical levels without significant compression of the
thecal sac; (3) no significant central or foraminal
stenosis at the L1-L2, L2-L3 and L3-L4 levels; and (4) a
disc bulge and spondylitic ridging minimally deforming
the thecal sac and abutting the L5 nerve root and
narrowing the left neural canal at the L4-L5 level.

On March 10, 2010, Root had a follow-up
appointment with Dr. Kuhlengel. Tr. 278. A physical
examination performed by Dr. Kuhlengel revealed that
Root moved easily from a prone to a sitting position and
from a sitting to a standing position; Root had no
palpable spasms throughout the lumbar paraspinal
muscles; her strength was normal (5/5) in all individual
muscle groups; and she ambulated with an erect posture
without an assistive device. Id.  Dr. Kuhlengel
concluded that no further surgical intervention was
necessary. Tr. 279. He further noted that Root would
benefit from comprehensive pain management services. Id.

Dr. Kuhlengel further stated that he would see Root on an as needed basis. Id.

An x-ray of the lumbar spine performed on March 10, 2010, revealed the metallic hardware and no instability of the spine on the flexion or extension views. Tr. 280.

On March 15, 2010, Root had an appointment with Dr. Wickey regarding her complaints of low back pain. Tr. 330-331. Root told Dr. Wickey that the surgery in September, 2009, provided her no benefit. Tr. 330. Root reported that oxycodone at a dosage of 5 mg provided slight benefit and that Soma did provide some relief. Id. Root described occasional right lumbosacral pain which radiated to the left side. Id. Other than some tenderness over the right lumbosacral junction approximately consistent with the L5-S1 facet joint and lower than the level of the surgery, the results of a physical examination were essentially normal. Id. Root had no paravertebral spasm or tenderness; she had no gluteal (buttock) or trochanteric (part of the hip)

tenderness; she demonstrated functional motion of the
lumbar spine noting some aggravation of pain in the end
range of flexion and extension; she had negative
straight leg raise tests bilaterally; she had normal
muscle strength (5/5) in the lower extremities; she had
normal bilateral deep tendon reflexes of 1+ in the lower
extremities;[32] she had normal sensation in the lower
extremities; and her gait and station were stable and
coordinated without the use of an assistive device. Id.
Dr. Wickey reported that Root's MRI revealed no clear
disc bulge and that the surgery did result in a
decompression of the spine. Tr. 331. Dr. Wickey's
assessment was that Root suffered from chronic low back
pain worse on the right and he prescribed oxycodone 10
mg two time per day. Id.

_____

32. "Deep tendon reflexes are normal if they are 1+, 2+
or 3+ unless they are asymmetric[.]" Deep Tendon
Reflexes, neuroexam.com, http://www.neuroexam.com/
neuroexam/content.php?p=31 (Last accessed March 26,
2014). Root's reflexes were symmetrical in that they
were the same in both lower extremities.

On March 25, 2010, Dr. Wickey after examining Root advised her to continue taking oxycodone 10 mg but he increased the frequency to three times per day. Tr. 328. He also advised her to do gentle stretching exercises. Id.  Dr. Wickey opined that Root was able to do light duty work, where she could sit, stand and walk as necessary. Id. Otherwise, Root could not perform a job that involved highly repetitive functions or required her to stay in one position for more than a few minutes. Tr. 328-329.

On April 29, 2010, Root had an appointment at Lebanon Pain Management Associates with Matthew Miller, a certified physicians assistant. Tr. 381. Mr. Miller reported Root was being managed on medication, and Root acknowledged that she felt oxycodone was working and her pain control was adequate. Id. Root informed Mr. Miller that there were some days when she forgot to take the mid-day dose because she felt "pretty good." Id.  Root reported that the side effects from the medication were tolerable and that her quality of life was better. Id.

43

Mr. Miller noted that Root was able to perform her
activities of daily living (e.g., cleaning her house)
and she did not require an assistive device for
ambulation. Id.  Root was advised to continue taking
oxycodone three times per day. Id.

On April 29, 2010, Jonathan Rightmyer, Ph.D., a
psychologist, reviewed Root's medical records on behalf
of the Bureau of Disability Determination and concluded
that Root suffered from depressive disorder, not
otherwise specified, but the condition was not a severe
impairment. Tr. 336 and 339.  Dr. Rightmyer stated that
Root had mild limitations with respect to activities of
daily living; no difficulties with respect to social
functioning; mild difficulties with respect to
concentration, persistence and pace; and no repeated
episodes of decompensation, each of an extended
duration. Tr. 346.

At an appointment with Pamela A. Weaner, M.D.,
on May 11, 2010, Root stated that since the surgery she
was unable to work unless it involved very light duty

44

with the amount lifted limited to about 5 to 10 pounds
and sitting and standing for limited amounts of time.
Tr. 486-487.

On June 2, 2010, Root had an appointment with
Dr. Wickey regarding complaints of right low back pain
radiating into the right lower extremity. Tr. 462. The
results of a physical examination were essentially the
same as those recorded on March 15, 2010. Id.  Dr.
Wickey referred Root for transforaminal epidural steroid
injections, which were performed on June 15 and June 29,
2010. Tr. 462, 464-465 and 552-554.

On July 7, 2010, Root was examined by Dr. Wickey
who observed that Root ambulated in a stable fashion
without the use of an assistive device; Root had some
bilateral lumbosacral tenderness, right greater than
left; Root's lumbar flexion was limited to 70 degrees
with pulling in the low back; Root's lumbar extension
was limited to 10 degrees with moderate aggravation of
her back pain; and the remaining physical examination
findings were the same as those found on March 15, 2010.

Tr. 607. Dr. Wickey recommended that Root have an
epidural lysis of adhesions of the spinal cord and
advised Root if that procedure did not provide any
benefit she should consider a spinal cord stimulator.
Tr. 608.

On July 27, 2010, Nicholas DeAngelo, D.O.,
performed an epidural lysis of the adhesions on Root's
spinal cord.[33] Tr. 545.  By August 10, 2010, Root
reported that the procedure provided no benefit and Dr.
Wickey diagnosed Root with failed back surgery syndrome,
status post L4-L5 posterior pedicle screw fixation and
decompression. Tr. 509. Dr. Wickey provided Root with

---

33.  "Epidural adhesions are most commonly caused by
hemorrhage into the epidural space following surgical
interventions in the lumbar spine and the healing that
subsequently occurs.  Leakage of this material into the
epidural space may cause an inflammatory response and
result in the formation of epidural adhesions.
Sometimes, these adhesions can lead to a persistent leg
pain following surgical procedures on the spine. With
the use of a special catheter and a combination of
medications, [a physician] will try to break up some of
the scar tissue with the goal of lessening [the] leg
pain." Lysis of Epidural Adhesions, Emory Healthcare,
http://www.emoryhealthcare.org/spine/procedures/interve
ntional-treatments/lysis-epidural-adhesions.html (Last
accessed March 27, 2014).

information on a spinal cord stimulator and also
increased her dosage of oxycodone to 20 mg every twelve
hours. Tr. 510.

On September 9, 2010, Dr. Angelo reported that
Root ambulated in a stable fashion without the use of an
assistive device; Root had bilateral lumbosacral
tenderness, right greater than left; her lumbar flexion
was less than 70 degrees with pulling in the low back;
she had negative straight leg raising tests bilaterally;
she had normal muscle strength and sensation in the
lower extremities; and her deep tendon reflexes were 1+
in both lower extremities. Tr. 601.

On October 7, 2010, Dr. DeAngelo reported that
Root was cleared for a spinal cord stimulator trial. Tr.
536.  The results of a physical examination on that date
were the same as those reported on September 9, 2010.
Id.

On November 4, 2010, Dr. Wickey implanted the
spinal cord stimulator. Tr. 527 and 538-540. On November
9, 2010, Root complained of no relief of her low back

pain, but reported excellent relief of her right lower extremity pain. Tr. 597.

On November 17, 2010, Root had an appointment with Dr. Margut, her primary care physician, for her annual gynecological examination. Tr. 512-513.  The report of this appointment is only notably in so far as it reveals that Dr. Margut was treating Root for depression with the drug citalopram and that after the appointment added Wellbutrin[34] to the treatment regimen for that condition. Id.  Dr. Margut also advised Root that she should consider counseling but Root was unsure whether she wanted to attend counseling. Id.

On December 7, 2010, Root reported to Dr. DeAngelo that the spinal cord stimulator provided no relief of her back pain but that she had excellent relief of her right lower extremity pain. Tr. 591. The results of a physical examination were the same as those

_____

34. Wellbutrin "is an antidepressant medication . . . used to treat major depressive disorder and seasonal affective disorder." Wellbutrin, Drugs.com, http://www.drugs.com/wellbutrin.html (Last accessed March 26, 2014).

reported on September 9, 2010. Id.  Dr. DeAngelo noted
that Root would "continue on medication management of
[oxycodone] and trazodone"[35] and consideration was given
to surgical implantation of a two-lead spinal cord
stimulator. Id.

On December 20, 2010, Root had an appointment
with Dr. Margut regarding complaints of depression,
gastroesophageal reflux disease, insomnia and low back
pain. Tr. 516. Root reported that she was feeling better
on the Wellbutrin plus the citalopram (Celexa). Id.  Dr.
Margut's objective findings were limited. Id. There were
no findings with respect to Root's spine reported. Id.
Dr. Margut's diagnostic assessment was that Root
suffered from depression which had improved,
gastrointestinal reflux disease which was under control
with Nexium (a protein pump inhibitor (ppi)), insomnia
which was being treated with trazadone, and low back

---

35. "Trazodone is an antidepressant medicine . . . used
to treat major depressive disorder." Trazodone,
Drugs.com, http://www.drugs.com/trazodone.html (Last
accessed March 26, 2014).

pain which was being treated by a pain management specialist. Tr. 516-517.

On January 4, 2011, Root had an appointment with Dr. DeAngelo at which she complained of low back pain radiating to the right lower extremity. Tr. 527-528. The results of a physical examination were the same as those reported on September 9, 2010. Id. Root ambulated in a stable fashion without the use of an assistive device; she had lumbosacral tenderness, right greater than left; her lumbar flexion was limited to 70 degrees with pulling in the low back region; her muscle strength in the lower extremities was normal; she had negative bilateral straight leg raising tests; and her sensation was intact in all dermatomes.[36] Tr. 527.  Dr. DeAngelo's

---

36. A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed March 26, 2014).

diagnosis included failed back surgery syndrome.[37] Tr.
557.  Dr. DeAngelo scheduled Root for a two-lead spinal
cord stimulator trial, which Dr. Wickey implanted on
February 1, 2011. Tr. 528-531 and 557.

On February 4, 2011, the two-lead spinal cord
stimulator was removed because Root was concerned about
possible infection. Tr. 564 and 587. An examination of
the insertion sight revealed no evidence of infection.
Id.  Also, Dr. DeAngelo after examining Root reported
that Root had normal muscle strength in the lower
extremities; she was able to go from a sitting to a
standing position without any difficulty; she was able
to ambulate without assistance; and she had normal
sensation in all dermatomes. Tr. 587.  On February 7,
2011, Root's dosage of oxycodone was increased by Dr.

---

37. The record of this appointment and the records of
prior appointments with Dr. DeAngelo reveal that he
never gave a definitive diagnosis but always a
differential one. A differential diagnosis is a process
of elimination and several possibilities are listed by
the physician. See Dorland's Illustrated Medical
Dictionary, 507 (32nd Ed. 2012).

Wickey from 20 mg every 12 hours to 30 mg every 12 hours. Tr.564.

On March 3, 2011, Root had an appointment with Dr. DeAngelo regarding ongoing complaints of low back pain. Tr. 583-584.  A physical examination revealed that Root could ambulate without assistance; she had "preserved range of motion of her cervical, thoracic and lumbar spine;" she was overweight; she had normal muscle strength in her lower extremities; and she had a "healed scar with focal tenderness in the right paravertebral area over the facet column and hardware." Tr. 583. The diagnostic assessment was that Root suffered from failed back surgery, right lumbar radiculopathy, lumbar spondylosis, epidural scar, chronic pain syndrome, depression and anxiety.[38] Id.  Root was continued on pain medications and scheduled for diagnostic facet injections. Tr. 583-584.  The injections were administered by Dr. Wickey on March 8, 2011, at multiple levels of the lumbar spine. Tr. 562 and 566-567.

---

38.  The diagnosis was not designated differential.

On March 28, 2011, Root visited Philhaven, complaining of depression and anxiety. Tr. 626.  Jeffrey Okamoto, M.D., a psychiatrist, conducted Root's intake evaluation. Id.  Dr. Okamoto's diagnostic assessment was that Root suffered from major depressive disorder, recurrent, moderate, and gave Root a current Global Assessment of Functioning (GAF) score of 45.[39] Id.  Dr.

---

39. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any

(continued...)

Okamoto's report does not set forth any mental status findings other than noting that Root had some suicidal thoughts 2 weeks prior to the intake evaluation but no present thoughts or plan. Id.  Dr. Okamoto noted that Root told him that she smoked and drank 8 cups of coffee per day. Id.

Root was examined by Jacqueline Hostetter, a certified registered nurse practitioner, associated with The Spine Specialists, on an unspecified date sometime after Root visited Philhaven and before April 5, 2011. Tr. 579-582. During that examination Root reported that her pain was stable, and it was relieved by soaking in a bathtub. Tr. 579. Root also stated she was smoking ½ pack of cigarettes per day. When nurse Hostetter reviewed Root's systems, Root denied that she suffered from anxiety and depression. Tr. 580. A physical

---

39. (...continued)
moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

examination revealed that Root had no tenderness in and normal curvature and mobility of the cervical and thoracic spine; and she had tenderness and moderate pain with motion of the lumbar spine. Tr. 581.  Root advised that she was able to perform her activities of daily living, and she exhibited no difficulty with ambulation. Id. Nurse Hostetter began Root on MsContin (Morphine Sulfate). Id.

On April 5, 2011, Dr. Wickey completed a Pennsylvania Department of Public Welfare form in which he stated in a conclusory fashion that Root was temporarily disabled for 12 months or more. Tr. 570. Dr. Wickey stated that the disability precluded any gainful employment. Id.  Dr. Wickey did not specify any work-related physical functional limitations, such as her ability to stand, walk, sit, lift or carry. Id.  Dr. Wickey noted that the temporary disability began on April 20, 2010 and was expected to last to an unknown date. Id. Dr. Wickey stated that the primary diagnosis was failed back surgery syndrome, status post L4-L5

decompression with pedicle screw fixation. Id.  Dr.
Wickey noted that the secondary diagnosis was lumbar
radiculopathy. Id.  He further noted that his assessment
was based upon physical examination findings, a review
of medical records and Root's clinical history. Id.
Also, on April 5, 2011, Dr. Wickey in a somewhat
inconsistent fashion completed a document entitled
Health-Sustaining Medication Assessment Form on behalf
of Root in which he opined that root needed the
medications oxycodone and opioids to "allow [Root] to be
employable or continue with employment." Tr. 569
(emphasis added).

On April 7, 2011, Alison Pidgeon, a Master of
Arts level therapist at Philhaven, reported that Root
responded well to treatment and that Root was "feeling
happier." Tr. 625.  Ms. Pidgeon also on April 28, 2011,
reported that Root was responding well to treatment. Tr.
624.

Root returned to see nurse Hostetter on April 15
and 26, 2011, for medication evaluations. Tr. 573-578.

56

When nurse Hostetter reviewed Root's systems on April 15th, Root again denied that she suffered from anxiety and depression. Tr. 577. She also denied that she suffered from joint swelling, neck stiffness, a gait disturbance, headaches or tremors. Id. Root complained that she had been vomiting and was sleepy since she began taking MsContin. Tr. 578. However, she was uncertain whether those conditions were caused by the medication or a virus she had picked up. Id.  Nurse Hostetter advised Root to continue taking the MsContin. Id.

On April 26th, Root told nurse Hostetter that she had moderate to severe low back pain which radiated to the right leg. Tr. 573.  When nurse Hostetter reviewed Root's system, Root denied anxiety, depression, difficulty concentrating, psychiatric symptoms, dizziness, gait disturbance, headaches, memory impairment, and tremors. Tr. 574. However, in the report of the April 26th appointment under clinical assessment, nurse Hostetter stated that Root "is severely depressed

57

as she is unable to work and has been denied
disability." Id.  Nurse Hostetter reported that Root was
"very weepy throughout the visit." Id. Nurse Hostetter
further reported that Root had tolerated the switch to
MsContin and MSIR[40] well. Id.

On April 28, 2011, Dr. Wickey completed a
Medical Source Statement form, which indicated that Root
in an 8-hour work day could only sit 2 hours, stand ½
hour and walk 0 hours but could occasionally (up to 1/3
of an 8-hour workday or 2.67 hours) lift up to 20
pounds. Tr. 620-622.  Dr. Wickey further indicated that
Root could with both upper extremities engage in simple
grasping, reaching, pushing, pulling, and fine
manipulation; Root could occasionally bend, squat,
kneel, and reach above shoulder level; and Root could
frequently carry (up to 2/3rd of an 8 hour work day).
Tr. 620-621.  Root could also occasionally operate a
motor vehicle. Tr. 621. Dr. Wickey stated that Root

_____

40.  MSIR is an abbreviation for Morphine Sulfate
Instant or Immediate Release.

could drive, shop, travel without assistance, ambulate without assistance, use standard public transportation, prepare a simple meal and feed herself, care for her own personal hygiene, and sort, handle and use paper or files. Tr. 622.

On May 16, 2011, Mustafa Karbeem, M.D., a psychiatrist, completed a statement of Root's ability to do work-related mental activities. Tr. 634-636. There are no treatment notes from Dr. Karbeem contained within the administrative record and his relationship with Root is unclear.[41] Dr. Karbeem opined that Root was moderately to markedly limited in her abilities to interact appropriately with supervisors, co-workers and the public, and respond appropriately to usual work situation and changes in a routine work setting. Tr. 635.

**DISCUSSION**

─────────────────

41. The only information that we have regarding the relationship is a statement in the ALJ's decision that Dr. Karbeem was a psychiatrist at Philhaven. Tr. 15.

The administrative law judge at step one of the sequential evaluation process found that Root had not engaged in substantial gainful work activity since September 22, 2009, the alleged disability onset date. Tr. 14. In so finding the administrative law judge also stated as follows: "The claimant's earnings record shows unemployment wages in 2009 of $3,980 in third quarter and $516 in the fourth quarter and $587 in the first quarter of 2010 (Exhibit 2D). Although not dispositive of disability, application for unemployment impacts credibility." Id.

At step two of the sequential evaluation process, the administrative law judge found that Root had the severe impairment of degenerative disc disease.[42]

---

42. An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities.  20 C.F.R. § 404.1521.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no

(continued...)

Id. The administrative law judge also found that Root had the medically determinable mental impairment of a mood disorder[43] but that it was not a severe impairment. Tr. 15.  In so finding the administrative law judge rejected the GAF score of 45 reported by Dr. Okamoto and the opinion of Dr. Karbeem who indicated that Root had difficulty interacting appropriately with supervisors, co-workers and the public, and responding appropriately to usual work situations and changes in a routine work setting. Id. The administrative law judge instead relied on the opinion of the state agency psychologist, Dr. Rightmyer, who found that Root did not suffer from a severe mental impairment. Tr. 16.

At step three of the sequential evaluation process the administrative law judge found that Root's

---

42.  (...continued)
more than a minimal effect on an individual ability to work.  20 C.F.R. § 404.1521; Social Security Rulings 85-28, 96-3p and 96-4p.

43.  Mood disorders are a broad category of disorders, including major depressive disorder; dysthymic disorder; depressive disorder, not otherwise specified; and bipolar disorder.

impairments did not individually or in combination meet or equal a listed impairment. Tr. 15-17.  The administrative law judge explained in detail her basis for her step three finding. Id.

At step four of the sequential evaluation process the administrative law judge found that Root could not perform her past relevant skilled, light work as an orthodontic laboratory technician and semi-skilled, medium work as a sewing machine operator but that she had the residual functional capacity to perform a limited range of unskilled, light work as defined in the regulations. Tr. 17.  Specifically, the administrative law judge found that Root could perform light work

> except the claimant can lift and/or carry 20 pounds occasionally, alternate sit and stand at will, occasionally bilaterally reach above the shoulder, bend, kneel, stoop and climb ramps and stairs, never climb ladders, ropes, and scaffolding, never crawl or twist, avoid moderate exposure to cold and concentrated exposure to heat, wetness, and humidity, all moving machinery, and unprotected heights. Mentally, the claimant is limited to unskilled work, defined as the ability to understand,

> remember, and carry out simple instructions,
> respond appropriately to supervision,
> coworkers and usual work situations, on a
> sustained basis, and deal with changes in a
> routine work setting.

Id.  In setting this residual functional capacity for
the relevant period September 22, 2009, to the date of
the administrative hearing, the administrative law judge
had to consider Root's reported symptoms and subjective
complaints in light of the objective medical facts in
the record and if her subjective complaints were not
substantiated by the objective medical evidence the ALJ
was required to make a finding as to the credibility of
her complaints. The ALJ when setting the residual
functional capacity as noted above considered Root's
credibility, past work and her activities of daily
living and the medical records covering the relevant
time period as well as medical records that predated the
alleged disability onset date. Tr. 14-20.

    The administrative law judge found that Root's
medically determinable physical and mental impairments

63

could reasonably be expected to cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform work consistent with the above-stated residual functional capacity. Tr. 18. The administrative law judge noted that limiting Root to simple, unskilled work adequately addressed any medication side effects. Tr. 20 and 22.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Root had the ability to perform both unskilled, sedentary and unskilled, light work. Tr. 21. The ALJ based on the testimony of a vocational expert identified two unskilled, sedentary work positions, as a food and beverage order clerk and surveillance system monitor, and one unskilled, light work position, as a information clerk, and that there

were a significant number of such jobs in the local, regional and national economies. Tr. 21.

The administrative record in this case is 659 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an excellent job of reviewing Root's vocational history and medical records in her decision. Tr. 12-23.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.

Root argues that the administrative law judge erred by (1) failing to include depression as a severe impairment,(2) disregarding the opinion of Dr. Karbeem regarding Root's mental functional abilities, (3)failing to include the side effects of claimant's medications in setting the residual functional capacity, (4) disregarding the opinion of Dr. Wickey, (5) disregarding a functional assessment by a non-medical state agency adjudicator, and (6) failing to find that Root's impairments met or equaled the requirements of a listed

impairment.  Based on our review of the record, we find no merit in Root's arguments.

With respect to Root's first argument that the administrative law judge failed to include depression as a severe impairment, the administrative law judge appropriately relied on the opinion of the state agency psychologist, Dr. Rightmyer, who opined that Root did not have a severe medically determinable mental impairment. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").  Moreover, the ALJ appropriately found that Root had a non-severe medically determinable mood disorder and included limitation in the residual functional capacity assessment to address that disorder. Root was limited to simple, unskilled light and sedentary work.

Root erroneously contends that the ALJ erred by disregarding the opinions of Dr. Wickey and Dr. Karbeem. The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000). The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law judge is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). In the present case, the administrative law judge in his

decision specifically addressed the opinions of Dr. Wickey and Dr. Karbeem as well as the credibility of Root. Tr. 15 and 18-20.

The social security regulations specify that the opinion of a treating physician may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. § 404.1508.

The administrative law judge appropriately considered the contrary opinion of Dr. Rightmyer and the objective medical evidence and concluded that the

opinions of Dr. Karbeem was not adequately supported by
objective medical evidence consisting of signs, symptoms
and laboratory findings. In rejecting the opinion of Dr.
Wickey, the ALJ appropriately considered his opinion,
Root's activities of daily living and her prior
employment and the medical evidence. The record reveals
that Dr. Wickey's opinion that Root could walk 0 hours
during an 8-hour work day was contrary to the actual
facts admitted in the record by Root.  Moreover, Dr.
Wickey's opinion was inconsistent.  According to Dr.
Wickey, Root could only walk 0 hours, stand ½ hour and
sit 2 hour during an 8-hour workday but Root also could
occasionally operate a motor vehicle and frequently
carry.  Frequently is defined as up to 2/3rd of an 8-
hour workday or 5.33 hours.  It is reasonable to
conclude that to carry an object you have to be standing
or walking, unless you are wheel-chair bound, and there
is no such evidence that Root was so constrained.
Because Root could frequently carry, Dr. Wickey
statement that she could only stand ½ hour in an 8-hour

workday is suspect.  Dr. Wickey also stated that Root
could ambulate without assistance, use standard public
transportation, prepare simple meals, care for her own
personal hygiene, and sort, handle and use paper or
files. There was a reasonable basis in the record for
the ALJ to reject the opinions of Dr. Wickey and Dr.
Karbeem.

The objective medical evidence regarding Root's
mental and physical condition before and after her
alleged disability onset date was very similar.  Prior
to the alleged onset date, Root was performing semi-
skilled to skilled, light to medium work. It is
reasonable to conclude that if there was no significant
deterioration in Root's condition after the alleged
onset date as compared to her condition prior to the
disability onset date that Root could still engage in
light to medium work.  The administrative law judge gave
Root the benefit of the doubt and reduced her capacity
to the unskilled, light work exertional level and in
fact identified sedentary jobs which she could perform.

The administrative law judge relied on the opinion of Dr. Rightmyer, the state agency psychologist, who review Root's medical records. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., *supra*.

Side effects accompany the taking of medications are not considered disabling unless the medical evidence references "serious" functional limitations. Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002). The medical records before and after the alleged disability onset date do not delineate any significant side effects. Neither Dr. Wickey nor Dr. Karbeem in there functional assessments indicated that side effects of Wickey's medications was a contributing factor. More importantly, the ALJ gave Root the benefit of the doubt and specifically limited Root to simple, unskilled work in light of the medications she was taking.

Root contends that the ALJ should have considered the opinion of a non-medical state agency adjudicator regarding Root's functional abilities. The

71

non-medical state agency adjudicator found that Root could only occasional lift 10 pounds and stand and walk at least 2 hours in an 8-hour workday. Tr. 385-388.  The ALJ did not address this opinion and appropriately so. This court has repeatedly stated that reliance on such a statement is inappropriate. See, e.g., Ulrich v. Astrue, Civil No. 09-803, slip op. at 17-18 (M.D.Pa. December 9, 2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662, slip op. at 15 (M.D. Pa. December 23, 2010)(Muir, J.); Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16 (M.D.Pa. January 11, 2011)(Muir, J.);  Peak v. Astrue, Civil No. 10-889, slip op. at 25 (M.D.Pa. January 24, 2011)(Muir, J.); see also Dutton v. Astrue, Civil No. 10-2594, slip op. at 22 n. 32(M.D.Pa. January 31, 2012)(Munley, J.); Demace v. Astrue, Civil No. 11-1960, slip op. at 36-37(M.D.Pa. April 25, 2013)(Munley, J.).

The purpose of the Listings of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience.  20 C.F.R. § 404.1525(a);

see also Sullivan v. Zebley, 493 U.S. 521, 532 (1990).
The Listings operate as a presumption of disability
without further inquiry as to whether the claimant can
actually perform prior relevant work or other work
available in the local, regional or national economies.
Id.  To qualify for benefits by showing that an
impairment, or combination of impairments, is equivalent
to a listed impairment, Root had the burden of
presenting "medical findings equivalent in severity to
all the criteria for the one most similar impairment."
Sullivan v. Zebley, 493 U.S. at 531; Bowen v. Yuckert,
482 U.S. 137, 146 n.5 (1987)(stating that it is the
claimant's burden to present medical findings that show
that his impairment matches or is equal in severity to a
listed impairment).

     The Social Security regulations require that an
applicant for disability insurance benefits come forward
with medical evidence "showing that [the applicant] has
an impairment(s) and how severe it is during the time
[the applicant] say[s] [he or she is] disabled" and

"showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

At step three of the sequential evaluation process the administrative law judge considered Listing 12.04 relating to depression and Listing 1.04C relating to her lumbar spine impairment and found that Root's conditions did not meet the requirements of those listings.

Root has proffered no medical opinion, nor has she marshaled the evidence in the record, to support her contention that her condition met or equaled the requirements of Listings 12.04 or 1.04C.

With respect to Listing 12.04 the evidence had to demonstrate that Root was markedly limited in two out of three mental functional areas (activities of daily living, social function and concentration persistence or pace) or one mental functional area and repeated episodes of decompensation, each of an extended

74

duration.  With respect to Listing 1.04C there had to be evidence that Root had an "inability to ambulate effectively."  The inability to ambulate effectively is defined at 1.00B2b as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of handheld assistive device(s) that limits the functioning of both upper extremities.

No treating or examining physician stated that Root's impairments met or equaled the criteria of Listings 12.04 or 1.04C. Furthermore, we are unable to determine from the bare medical records that Root's conditions met or equaled the criterial of those listings. The administrative law judge reviewed the listings and gave an adequate explanation for finding that Root did not meet or equal the criteria of a listed impairment.

As stated above when there is a paucity of objective medical facts supporting a claimant's alleged

symptoms, the administrative law judge has to consider the claimant's credibility.  To the extent that Root argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Root's claims regarding her physical and mental impairments. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and

76

assess the witness credibility."). Because the administrative law judge observed and heard Root testify, the administrative law judge is the one best suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into account all of Root's physical and mental limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

                              s/Sylvia H. Rambo
                              United States District Judge

Dated:  March 31, 2014.